# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| **BRENDA M. REVERE,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **CIVIL ACTION FILE NO.** |
| **v.** | : | **1:02-CV-1575-AJB** |
| | : | |
| **BOOTH RESEARCH SERVICES,** | : | |
| **INC.,** | : | |
| | : | |
| **Defendant.** | : | |

## FINDINGS OF FACT,
## CONCLUSIONS OF LAW, ORDER AND OPINION

This case was tried by the Court on various dates between December 1 and December 15, 2004.[1]  Plaintiff, Brenda M. Revere, sought damages from Defendant, Booth Research Services, Inc., for gender discrimination in violation of  Title VII of the

---

[1]      This matter initially was referred to the undersigned for a special master trial pursuant to N.D. Ga. IOP 920-2(a) and FED. R. CIV. P. 53.  After the special master trial started, the parties orally consented to the undersigned's jurisdiction, waived a trial by jury, and agreed that the proceedings which already had occurred in the special master proceeding were to be considered as part of the record for a binding trial before the undersigned.  Tr. 608-11, 729.  The parties then executed the consent form and it was approved by the District Judge.  [Docs. 104, 105].  The parties therefore have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73.  Thus, this order and opinion constitutes a final order of the court.

AO 72A
(Rev.8/8
2)

Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"); race

discrimination in violation of Title VII and 42 U.S.C. § 1981; unlawful retaliation in

violation of Title VII and § 1981; and the Georgia state law claims of negligent hiring,

training, retention and supervision.[2]   After carefully considering the evidence and

applicable law, as well as the parties' arguments and post-trial briefs, the Court makes

the following findings of fact and conclusions of law, as required by FED. R. CIV. P.

52(a):[3]

## FINDINGS OF FACT

1.     Plaintiff, Brenda M. Revere ("Revere"), is an African-American female.  (Tr. 201-

02).

_____

[2]      On June 7, 2004, the District Court entered summary judgment against Plaintiff as to all other claims asserted in her amended complaint.  [Doc. 88].

[3]      At trial, the undersigned orally ruled on various motions then pending, but the docket does not reflect the Court's rulings.  Defendant's motion to dismiss or in the alternative to compel arbitration [Doc. 96], and motion to amend the pretrial order [Doc. 97], both filed on the eve of the special master trial, were **DENIED** on the grounds that Defendant waived its right to compel arbitration and the motions were otherwise untimely.  Tr. 4-6.  Defendant's motion in limine [Doc. 95] was **GRANTED IN PART AND DENIED IN PART**.  Tr. 17-22.

AO 72A
(Rev.8/8
2)

2.     Defendant, Booth Research Services, Inc. ("BRS"), operates a market research firm.   One aspect of BRS's business involves employing telephone interviewers to conduct market surveys of products for BRS's clients.

3.     In March 1984, BRS hired Revere to work as a senior supervisor in BRS's telephone operation center.  (Tr. 1104-05).  Revere remained a senior supervisor at BRS until 1991.  (Tr. 1106).

4.     In 1991, BRS promoted Revere to the position of phone center manager.  (Tr. 1107).  A 1998 job description provides the following summary of Revere's position:

> The primary purpose of this position is managing the operations of the phone center.  Duties and responsibilities include quality control, employee training, system improvement in conjunction with VP of Operations and compliance with project deadlines.  Additional duties include managing the Human Resources Department as it relates to the phone center.  Reports to VP of Operations.

(Plaintiff's Exhibit 9).

5.     In 1998, Elizabeth Ann Wilson ("Wilson") became the VP of Operations for BRS and Revere's immediate supervisor.  (Tr. 517).

6.     Wilson is a Caucasian female.  (Tr. 656).  (Plaintiff's Exhibit 117).

7.     In January 2002, Revere's employment as BRS's phone center manager was terminated.  (Plaintiff's Exhibit 125).

3

AO 72A
(Rev.8/8
2)

8.      The Court finds that Wilson acted as the sole decisionmaker in terminating Revere's employment at BRS. (Tr. 167-68 ).[4]

9.      In the letter that Wilson gave to Revere on the morning of her termination, the stated reason for Revere's dismissal was "reduction in work force in phone center area."  (Plaintiff's Exhibit 125).

10.     The Court finds credible the testimony of Laura McKown, the certified public accountant for BRS, who testified about the financial conditions at BRS in the months preceding Revere's termination.  (Tr. 51).

11.     In December 2001, McKown met with Peter Booth, the president and owner of BRS, to discuss the company's financial condition.  (Tr. 61).

---------------------------

[4]      At trial, Revere attempted to argue that Sue Shirley, personnel manager for BRS, acted as a quasi-decisionmaker in terminating Revere's employment under a "cat's paw" theory.  The "cat's paw" theory provides that causation may be established when a plaintiff shows that the decisionmaker followed the biased recommendation of a party with no actual power to discharge the employee without independently investigating the complaint against the employee.  *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1248 (11th Cir. 1998).  In this case, however, Revere failed to introduce any evidence establishing that Shirley influenced Wilson's decision to terminate Revere's employment.  The uncontradicted testimony of Wilson establishes that Shirley was not consulted when Wilson decided which employees to terminate. (Tr. 685).

12.     McKown advised Booth that his company was in danger of failing unless significant budget cuts were made in the company's general administrative expenses. (Tr. 62-64).

13.     BRS's general administrative expenses includes all fixed expenditures, such as the rent and the salaries for staff employees.  (Tr. 59-60).

14.     As phone center manager, Revere was a staff employee whose salary was a component of BRS's general administrative expenses.  (Tr. 69).

15.     After examining the decrease in revenue being generated by the phone center when compared to its operating costs, McKown recommended to Booth that he specifically eliminate the position of phone center manager.  (Tr. 67).

16.     The Court finds that Peter Booth was a credible witness who provided truthful testimony.  (Tr. 1520).

17.     After his meeting with McKown, Booth informed Wilson that BRS was in financial distress and that cutbacks and a reduction in force was necessary in order to save the company.  (Tr. 684).  The meeting between Booth and Wilson took place in late December 2001.

18.     Booth directed Wilson to reduce the number of salaried employees in her area, as well as any employees receiving pay for a guaranteed number of hours.  (Tr. 236).

5

The Court finds, however, that there is no evidence that Booth, acting on McKown's recommendation, told Wilson to specifically cut the position of phone center manager. (Tr. 562; 161).

19.     Although Wilson failed to remember certain facts that a decisionmaker should have been able to recall, the Court finds her testimony credible as to the facts that she did remember, because Wilson's testimony was consistent with the testimony given by Booth and substantiated by the testimony of other witnesses that also testified at trial. (Tr. 1522).

20.     Wilson terminated three employees in her area: Kenyon Martin, the assistant personnel manager; Francine Thomas, the assistant phone center manager; and Revere. (Tr. 564; 687).

21.     Like Revere, Thomas and Martin are African-American. (Plaintiff's Exhibit 124).

22.     Francine Thomas is a female.  (Tr. 902).  Kenyon Martin is a male. (Tr. 426).

23.     On April 24, 2001, a memo was circulated to all BRS employees concerning a change in Revere's supervisory authority:

> The company has been reviewing Phone Center policies and procedures and as a result of that review, the decision has been made to realign the Personnel Department as a direct report to the Operations VP rather reporting [sic] to the Phone Center Manager.  I believe this will improve the checks and balances for these two departments and eliminate any

6

concerns employees might have about bringing Phone Center grievances to the Personnel Department.

Effective immediately, Sue Shirley, Personnel Manager will begin reporting to Beth Wilson, Operations VP. Furthermore, Kenyon Martin will now be assigned exclusively to the Personnel Department as Personnel Assistant.

(Plaintiff's Exhibit 45).

24.    The April 24, 2001, memo was sent to BRS's employees by Booth. (*Id.*). The Court finds, however, that Wilson actually made the decision to terminate Revere's supervision of Shirley. (Tr. 162; 524).

25.    The Court finds that the relationship between Revere and Wilson became strained after Wilson terminated Revere's supervisory authority over Shirley. (Tr. 157). In the days immediately following the change in supervisory authority, Wilson and Revere became involved in an argument at lunch in front of other BRS employees. (Plaintiff's Exhibit 47). On April 26, 2001, Wilson gave Revere a formal warning as a result of the incident. (Plaintiff's Exhibit 47). The April 26, 2001, warning was the first and only warning that Revere received while employed by BRS. (Tr. 1300).

26.    In the months leading up to Wilson's termination of Revere's supervisory authority over Shirley, Revere had expressed concerns that Shirley's application of

7

BRS's personnel guidelines to the employees in the telephone operation center was arbitrary. (Tr. 524).

27.    On July 23, 2001, Revere sent Wilson a memorandum concerning Shirley. The initial paragraph of that memo stated:

> The purpose of this letter is to express my many concerns with Sue Shirley. Sue's role in Personnel is very important and is a role in which you should not exhibit bias, favoritism and prejudice. In the past several weeks there have been discrepancies in the application of rules. It appears that some of the interviewers are not being treated fairly and[/]or equally.

(Defendant's Exhibit 1).

28.    Revere testified that the July 23, 2001, memo was the first written document that she sent to Wilson outlining her belief that Shirley's treatment of the employees in the telephone operation center was motivated by racial discrimination.   (Tr. 1128). Specifically, Revere complained that Shirley displayed favoritism towards Beverly Simmons, Beth Corley, and B.K. Sadat.   Both Simmons and Corley are Caucasian females; Sadat is an Iranian male.

The Court finds, however, that Revere's testimony concerning the July 23, 2001, memo lacks credibility.   Revere first testified that she did not use phrases like "racial discrimination" in the July 23, 2001, memo for fear of retribution.   Yet, she later testified that she verbally complained of racial discrimination in the meeting that took place as

8

a result of the memo.  This Court finds it incredible that Revere would refrain from alleging racial discrimination in writing out of fear of retribution and then later verbally express her concerns of racial discrimination to the very individuals she believed would retaliate against her if her concerns were expressed in writing.  (Tr. 1523-24).

29.    Consequently, the Court finds credible Wilson's testimony that she did not assume that Revere's July 23, 2001, memo was alleging that Shirley's actions were racially motivated.  (Tr. 680).

30.    The Court also finds credible Booth's testimony that Revere did not inform him that she was concerned about the mistreatment of African-American employees in the telephone operation center.  (Tr. 157-58).

31.    Nevertheless, the Court finds that, prior to her termination, Revere did complain of racial bias at BRS.  In January 2002, Revere told Wilson that the phone center handbook was being referred to as the "nigger handbook" because certain supervisors and interviewers felt as though the handbook was being applied only in reference to them.  (Tr. 635).

32.    At the same time, the Court finds credible Wilson's testimony that Revere made this statement the night before the papers on Revere's termination were submitted, but after Wilson's decision to terminate Revere had been made.  (Tr. 636).

33.   After becoming the vice-president of operations at BRS, Wilson held annual holiday luncheons for BRS supervisors at the Dunwoody Country Club - - a private, mostly Caucasian club.  (Tr. 633).

34.   In 2000, Wilson stated to Revere and the other supervisors attending the holiday luncheon: "I really enjoy walking in here with y'all."  (Tr. 634). Wilson concedes that she made this statement to Revere and the other supervisors partly because people turned their heads when Wilson walked in with African-Americans, since it was her impression that African-Americans were not commonly seen there.  (Tr. 634).

35.   Revere contends that, after none of the African-American supervisors attended Wilson's annual holiday luncheon in December 2001, Wilson sent Revere an e-mail asking why the African-American supervisors failed to appear.  According to Revere, the e-mail asked "what the hell is going on?"  (Tr. 1175).

Ms. Revere earlier testified that she always kept in her desk drawer copies of most of the e-mails that she was sent at work and that she took those e-mails with her on the date of her termination.  (Tr. 1232).  In light of the issues that Revere argues she had faced at BRS and the numerous other e-mails introduced into evidence by Revere at trial, the Court finds Revere's inability to produce Wilson's e-mail concerning the

10

AO 72A
(Rev.8/8
2)

2001 holiday luncheon a serious impediment to the credibility of Revere's testimony on this topic.

36.    The morning of Revere's termination, Wilson laughed and giggled in the reception area of BRS's office.  (Tr. 623-25; 846).

37.    Derrin Bellamy testified that, after seeing Beth Wilson laughing and giggling in BRS's reception area the morning of Revere's termination, Bellamy heard Wilson reply, "I got rid of her, that black troublemaker."   According to Bellamy, Wilson made this statement after being admonished by BRS receptionist Shirley Roberts that the situation was not funny.  (Tr. 846).  By Bellamy's own account, however, he could not see Wilson while she was allegedly making the comment because a wall stands between the place where Bellamy was walking and the reception area where Wilson was allegedly standing at the time the purported comment was made. (Tr. 846).  Further, the Court finds that Bellamy's resignation letter, which expressed his appreciation for the opportunity to work at BRS and described his position as a great job, casts significant doubt on the truthfulness of this testimony.  Bellamy resigned his position not long after Revere's termination and, thus, not long after supposeldy hearing Wilson's purported comment.  The Court finds it incredible that Bellamy (who is African-American) would

AO 72A
(Rev.8/8
2)

write a glowing review of BRS after having witnessed Wilson indicate that her decision to terminate his immediate supervisor was due to her race.

38.     The Court finds that Revere failed to introduce any evidence pertaining to the claim that her termination was due to sex or gender discrimination.  There was no evidence introduced to the Court showing that Wilson displayed either animus toward females or took gender into consideration in making the decision as to which employees would be terminated as part of the reduction in force.  To the contrary, the record shows that Wilson included both genders in the reduction taking place in January 2002 by terminating Martin in addition to Thomas and Revere.   (Tr. 564; 687).  Further, Revere testified at trial that she believes her termination had to do with her race, her speaking out against racial injustice, and nothing else.  (Tr. 1287-88).

39.     The Court finds that David Smeltzer, a Caucasian male,  assumed some of the responsibilities that Revere had as phone center manager after Revere's termination. (Tr. 852-53; 1073; 1098-99).   The Court further finds that the phone center manager's remaining responsibilities were divided between Wilson, Shirley, and Schwartz.   (Tr. 1098-99).

40.     The Court finds that Dottie Nix is not similarly situated to Revere because Nix was an officer, as opposed to a staff employee, at BRS.  (Defendant's Exhibit 68).  As

12

a fellow officer, Wilson did not have supervisory authority over Nix and did not act as the decisionmaker when Nix was offered the opportunity to keep her position with reduced pay rather than having her employment terminated.   (Tr. 162).

41.    The Court finds that Shirley, as the personnel manager and a former assistant personnel manager, was responsible for managing unemployment claims at BRS. (Tr. 696).

42.    The Court finds that Revere, though having served as Shirley's manager, did not have comparable experience with unemployment claims.

43.    The Court finds credible Wilson's testimony that her decision to retain Shirley was motivated by a concern that unemployment claims would increase in light of the additional layoffs that might have been necessary at BRS due to the company's financial condition.  (Tr. 694-96).

44.    The Court finds that Revere actively disputed Grenetta McKinstry's claims of racial discrimination while employed at BRS. McKinstry had claimed she was discriminated against because she was African-American.  (Tr. 1206-8).

AO 72A
(Rev.8/8
2)

## CONCLUSIONS OF LAW

**I.      Race Discrimination under Title VII and §1981.**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e-2(a)(1).   "The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context."  *Rice-Lamar v. City of Fort Lauderdale*, 232 F.3d 836, 843 n.11 (11th Cir. 2000).  Accordingly, to prevail on her claims of racial discrimination under Title VII and § 1981,  Revere must prove each of the following facts by a preponderance of the evidence:

1.      That she was discharged from her employment with BRS; and

2.      That her race was a substantial or motivating factor that prompted BRS to terminate her employment.

**A.      Adverse Employment Action**

"[T]o support a claim under Title VII's anti-discrimination clause[,] the employer's action must impact the 'terms, conditions, or privileges' of the plaintiff's job in a real and demonstrable way."  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001).  Accordingly, a plaintiff seeking to prevail on a race

14

discrimination claim under Title VII or § 1981 is required to demonstrate the existence of an adverse employment action.  *See Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 760-61 (1998).  "An adverse employment action is an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587 (11th Cir. 2000).  In this case, the evidence is undisputed that Revere was discharged from her employment with BRS in January 2002.  (Tr. 167-68; Plaintiff's Exhibit 125).   Thus, this Court concludes that Revere has demonstrated that she was subjected to an adverse employment action under Title VII and § 1981.  *See Ellerth*, 524 U.S. at 761 ("A tangible employment action constitutes a significant change in employment status, such as . . . firing").

**B.     Race as a Substantial or Motivating Factor**

In addition to proving an adverse employment action, Revere is required to establish by a preponderance of the evidence that race was a substantial or motivating factor in the decision to terminate her employment.  *See* 42 U.S.C. § 2000e-2(m) ("[A]n unlawful employment practice is established when the complaining party demonstrates that race . . . was a motivating factor for any employment practice, even though other

factors also motivated the practice.").   Revere's claims are premised upon a disparate

treatment, as opposed to a disparate impact, theory of liability:

> Disparate treatment is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race [or] color·. . . .  Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment.

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335-36 (1977).

To prove discriminatory intent under a disparate treatment theory of liability, Revere

may rely on either direct or circumstantial evidence.   *Nix v. WLCY Radio/Rahall*

*Communications*, 738 F. 2d 1181 (11th Cir. 1984).

**1.    Direct Evidence of Discrimination**

The Eleventh Circuit has found direct evidence of discriminatory intent where

"actions or statements of an employer reflect[ ] a discriminatory or retaliatory attitude

correlating to the discrimination or retaliation complained of by the employee." *Merritt*

*v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (quoting *Caban-Wheeler*

*v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990)).   However, "only the most blatant

remarks, whose intent can be nothing other than to discriminate on the basis of [race]

. . . constitute direct evidence of discrimination."      *Bass v. Board of County*

*Commissioners*, 256 F. 3d 1095, 1105 (11th Cir. 2001) (quoting *Damon v. Fleming*

16

*Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999)).  In this case, Revere introduced testimony from Derrin Bellamy that, on the morning of Revere's termination, Wilson stated, "I got rid of her, that black troublemaker."  Though this statement, if true, demonstrates a discriminatory attitude correlating to the discrimination that Revere complains of, this Court has found that Bellamy's testimony was not credible.  As noted, direct evidence is "evidence which, <u>if believed</u>, would prove the existence of discrimination without inference or presumption."  *Holifield v. Reno*, 115 F.3d 1555, 1561 (11th Cir. 1997) (quoting *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989)) (emphasis added).  This Court heard no credible direct evidence that the improper consideration of race played a role in the decision to terminate Revere.

**2.    Circumstantial Evidence of Discrimination**

Absent direct evidence of discriminatory intent, a plaintiff is required to prove racial animus by circumstantial evidence.  In this case, Revere has demonstrated that in the months preceding her termination, Wilson eliminated her supervisory authority over Shirley, became involved in a verbal altercation with Revere at lunch, and formally reprimanded Revere.  While this evidence might suggest that animosity existed between Wilson and Revere, it does not suggest that Wilson harbored any racial bias towards Revere.  In *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir. 1986), the Eleventh

17

Circuit noted that "[p]ersonal animosity is not the equivalent of . . . discrimination and is not proscribed by Title VII."  Consequently, this evidence  fails to establish that Wilson's decision to terminate Revere was motivated by Revere's race.  *See Hawkins v. Ceco Corp.*, 883 F. 2d 977, 986 (11th Cir. 1989) ("[D]islike alone is not evidence of racial discrimination.").

In addition, this Court concludes that Revere is unable to demonstrate that Wilson's decision to retain Shirley, as opposed to Revere, was motivated by racial animus.  Although Revere introduced evidence that Shirley misrepresented her college education on the application for employment at BRS and that Revere had actually obtained a college degree, Wilson testified that her decision to retain Shirley was based solely on the company's need to have a person more experienced with unemployment claims because of the possibility of additional layoffs.   (Tr. 694).   Though Revere appears to argue that terminating Shirley would have been the more rational business decision, "federal courts do not sit to second-guess the business judgment of employers."  *Combs v. Plantation Patterns*, 106 F. 3d 1519, 1543 (11th Cir. 1997). This Court has found that Shirley was more experienced with unemployment claims than Revere.  Therefore, Revere has failed to prove that the difference in treatment between Shirley and herself was motivated by the impermissible consideration of race.

18

## II.    Sex Discrimination under Title VII

Title VII also makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  To prevail on her claim of sex discrimination  under Title VII, Revere must prove each of the following facts by a preponderance of the evidence:

1.    That she was discharged from her employment with BRS; and

2.    That her sex was a substantial and motivating factor that prompted BRS to terminate her employment.

Because Revere's discharge is undisputed, the Court focuses its analysis on the second prong of Revere's sex-discrimination claim.   Excluding the evidence introduced pertaining to her own sex, Revere has failed to introduce any evidence that Wilson's decision to terminate her employment was motivated by gender.  Further, any inference of discriminatory intent created by Revere's status as a female was negated by Wilson's decision to simultaneously terminate Martin, a male employee.  *See Mitchell v. Jefferson County Bd. of Educ.*,  936 F. 2d 539, 546 (11th Cir. 1991) (holding that where men and women are treated the same, the plaintiff fails to demonstrate that intentional gender discrimination was a factor in an employment decision).  Thus, Revere has failed to

19

establish by a preponderance of the evidence that her sex served as a substantial factor in Wilson's decision to terminate her employment.

### III.    Retaliation under Title VII and § 1981

Title VII also makes it an unlawful employment practice for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  The Eleventh Circuit also has recognized that § 1981 includes a cause of action for retaliation, but that the elements of such a claim are unsettled.  *Tucker v. Talladega City Schools*, 2006 WL 688976 * 4 (11th Cir. March 20, 2006) (unpublished opinion) (citing *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412-13 (11th Cir. 1998)).  Unlike claims for Title VII and § 1981 racial discrimination, the Eleventh Circuit has suggested that there might be a distinction between the elements of a Title VII retaliation claim and those for a § 1981 retaliation claim.  *See Bass*, 256 F.3d at 1120 n.10; *Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997).  The parties in this case do not appear to argue that they are different, and therefore, the Court assumes for purposes of this case that they are the same.

AO 72A
(Rev.8/8
2)

To prevail on her claims of unlawful retaliation under Title VII and § 1981, Revere must prove each of the following facts by a preponderance of the evidence:

1.    That she engaged in statutorily protected activity, that is, that she in good faith asserted objectively reasonable claims of [in the context of § 1981, racial] discrimination prohibited by federal law;

2.    That an adverse employment action then occurred;

3.    That the adverse employment action was causally related to her statutorily protected activities; and

4.    That she suffered damages as a proximate or legal result of such adverse employment action.

*See Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227 (11th Cir. 2006). The Court concludes that Revere is unable to demonstrate that her discharge was causally related to the claims of discrimination that Revere made to Wilson. The Court has found that the only claim of racial discrimination that Revere made to Wilson prior to her termination was Revere's statement concerning the employee handbook. The evidence establishes, however, that Wilson's decision to terminate Revere was made before this conversation. (Tr. 636). Thus, even though Revere's termination occurred after the conversation, there is no possibility that Revere's complaint influenced a determination that Wilson had already made. *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 272 (2001) ("Employers need not suspend previously planned

21

transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.").

### IV.   Negligent Hiring, Training, Retention and Supervision

Under Georgia law, an "employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable from the employee's 'tendencies' or propensities that the employee could cause the type of harm sustained by the plaintiff." *Munroe v. Universal Health Servs., Inc.*, 277 Ga. 861, 863, 596 S.E.2d 604, 606 (2004). In this case, however, Revere has failed to prove that BRS could have reasonably known of Wilson's alleged discriminatory tendencies.  Revere contends that a prior discrimination case involving Grenetta McKinstry and BRS should have put BRS on notice as to Wilson's discriminatory tendencies.  (Defendant's Exhibit 19). In that discrimination case, however, Revere herself supplied an affidavit to the Court stating that the complainant had not been a victim of racial discrimination while working at the company.  (Tr. 1207; Defendant's Exhibit 20).  In light of Revere's own previous assertions that McKinstry's claims were meritless, this Court concludes that BRS had no reasonable basis for knowing that Wilson had any discriminatory tendencies.  *See*

22

*Munroe*, 277 Ga. at 863, 596 S.E.2d at 606 ( "[A]n employer may be held liable only where there is sufficient evidence to establish that the employer reasonably knew or should have known of an employee's 'tendencies' to engage in certain behavior relevant to the injuries allegedly incurred by the plaintiff.").

Moreover, Plaintiff did not introduce any evidence whatsoever which would support a claim that Wilson was negligently trained.

Accordingly, Revere has failed to satisfy her burden of proof in establishing BRS's negligence.

Accordingly, on all of Plaintiff's claims tried to the Court, the Court finds against Plaintiff and in favor of Defendant.

In accordance with the Findings of Fact and Conclusions of Law entered by the Court, it is **ORDERED, ADJUDGED and DECREED** that the Clerk shall **ENTER** judgment against the plaintiff, Brenda M. Revere, and in favor of the defendant, Booth Research Services, Inc., on plaintiff's claims of sex discrimination under Title VII; racial discrimination under Title VII and § 1981; unlawful retaliation under Title VII and

23

§ 1981; and plaintiff's state-law claims of negligent hiring, training, retention and supervision.[5]

**IT IS SO ORDERED and DIRECTED**, this the 24rd day of March, 2006.


**S/ Alan J. Baverman**

——

**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

---

[5]      As noted previously, the Court **DENIES** Defendant's motion to dismiss or in the alternative to compel arbitration [Doc. 96], and motion to amend the pretrial order [Doc. 97].  Defendant's motion *in limine* [Doc. 95] is **GRANTED IN PART AND DENIED IN PART.**

24

AO 72A
(Rev.8/8
2)